# In the United States Court of Federal Claims

No. 08-410C
(Filed June 4, 2009)

```
* * * * * * * * * * * * * * * * * * * * *   *
                                            *   Pre-award bid protest; 28 U.S.C.
RHINOCORPS LTD. CO.,                        *   § 1491(b)(1) (2006); small-
                                            *   business set-aside; 48 C.F.R.
                    Plaintiff,              *   (FAR) § 52.219-14(b)(1) (2006),
                                            *   50% limitation on sub-
        v.                                  *   contracting; FAR 19.502-2(b)
                                            *   (2006); FAR 19.601, referral to
THE UNITED STATES,                          *   Small Business Administration
                                            *   for Certificate of Competency;
                    Defendant.              *   supplementation of adminis-
                                            *   trative record.
* * * * * * * * * * * * * * * * * * * * *   *
```

Ross L. Crown, Albuquerque, NM, for plaintiff.

Courtney E. Sheehan, Washington, DC, with whom was Deputy Assistant Attorney General Michael F. Hertz, for defendant.  Marvin Gibbs, United States Air Force Legal Operations Agency, Arlington, VA, of counsel.

## MEMORANDUM OPINION AND ORDER 1/

**MILLER**, Judge.

This pre-award bid protest is before the court after argument on the parties' cross-motions for judgment on the administrative record.  The United States Air Force ("the Air Force") decided not to solicit a small business set-aside follow-on contract after the expiration of plaintiff's contract.  Plaintiff challenges this decision as unreasonable and in violation of applicable procurement regulations.

---

1/  This opinion originally was filed under seal on May 18, 2009.  By ¶ 4 the parties were requested to notify the court of any redactions.  The redactions requested are denoted by brackets.

## BACKGROUND

The following facts are from the administrative record ("AR"). 2/ RhinoCorps Ltd. Co. ("plaintiff") is a small business incorporated in New Mexico. Plaintiff filed suit against the United States for problems stemming from acquisition of services that the Air Force had procured from plaintiff under an expired contract (the "ARSS contract"). 3/ See Complaint for Declaratory Judgment and Injunctive Relief filed June 3, 2008, ¶¶ 2-3.

On May 29, 2003, the Air Force Nuclear Weapons Counterproliferation Agency, which subsequently was called the 709th Armament System Squadron (the "ARSS"), merged with the Air Force Nuclear Weapons Center, and now referred to as the Air Force Nuclear Systems Squadron (the "NSS"), 4/ awarded Contract No. F29601-03-C-0203 for programmatic services supporting weapon systems development to plaintiff through a competitive small business set-aside. Compl. ¶ 4. The contract incorporated by reference 48 C.F.R. (FAR) § 52.219-06 (2006), setting aside acquisitions for qualifying small businesses. Also incorporated by reference was FAR 52.219-08, which implements a policy to allow qualifying small businesses the maximum opportunity to participate in performing federal contracts. FAR 19.502-2(b) applied, as well, and mandates that a contract with the value and performance characteristics of the ARSS contract would be awarded to a small business upon an agency determination that at least two responsible small businesses would be reasonably expected to submit offers. This regulation is the centerpiece of this litigation. Plaintiff, with the highest rated technical proposal and the lowest proposed price, secured

---

2/ The citations made to documents not included in the administrative record are relied on by the parties in their cross-motions and submitted as appendices filings to briefs before the administrative record was filed.

3/ The contract had a ceiling of over $17 million. It covered labor, supplies, hardware, materials, travel, and other direct costs associated with the Nuclear Weapons and Counterproliferation Agency. See Complaint for Declaratory Judgment and Injunctive Relief filed June 3, 2008, ¶¶ 4-5.

4/ It is unclear from the record the date when the ARSS became the NSS. Although the acronyms ARSS and NSS have appeared in prior filings by the parties and opinions of the court, the court will hereinafter refer to the NSS as the agency initiating the subject procurement. See RhinoCorps Co. v. United States, 85 Fed. Cl. 712 (2009) (order granting, in part, motion to dismiss), withdrawn and reissued (May 15, 2009); RhinoCorps Co. v. United States, 86 Fed. Cl. 642, 2009 WL 961215 (Apr. 7, 2009) (order granting preliminary injunction), withdrawn and reissued (May 15, 2009).

award.  Plaintiff agreed to a two-year contract term with three one-year option periods.  The ARSS contract expired on May 29, 2008.  Compl. ¶ 4.

Another contractor receiving work from the NSS was ITT-Advanced Engineering & Sciences ("ITT-AES"), an other-than-small-business contractor.  ITT-AES was the prime contractor on what is called the DTRIAC contract with the Air Force, which pre-dated the ARSS contract.  The DTRIAC contract was a ten-year contact administered by the Defense Threat Reduction Agency (the "DTRA") during 2003.  The DTRA is division of the Department of Defense.  On or about December 21, 2004, the DTRA issued ITT-AES a delivery order to provide work  "substantially the same as the statement of work for the ARSS Contract."  Id. ¶ 13.

On January 24, 2008, the ARSS contracting officer announced through a commercial procurement tracking service, INPUT Federal Technology Opportunities, that plaintiff's ARSS contract would not be recompeted, but would be "fulfilled through an ongoing, current contract out of another Contracting Office."  Id. ¶ 16 (quoted source not cited in original).

On January 28, 2008, Joan Fulkerson, Director of Small Business Programs, Air Force Research Laboratory ("AFRL") & Kirtland Air Force Base, e-mailed Roger Shinnick, Division Chief at AFRL contracting, requesting an update about the ARSS contract, questioning "where the work [was] going" and whether a large contractor was going to be performing the remaining work.  AR at 498-99.   Mr. Shinnick forwarded the e-mail to Shirley D. Lindom, Contracting Officer, who responded by e-mail on January 29, 2008, that Nuclear Weapons Center (the "NWC") 5/ determined that it could satisfy future needs with a current contract.  She also commented that "I don't think any government source told [plaintiff] that they didn't want to spend resources on a source selection.  That was not a factor Nuclear Weapons used in determining the direction they chose."  AR at 498.  Several other internal e-mail exchanges confirmed that the Air Force decided, as early as September 2007, that the Air Force did not want to re-compete plaintiff's contract and could utilize ITT-AES's contract to serve its contracting needs.  See, e.g., AR at 656 (Jan. 25, 2008); 660-61 (Jan. 29, 2008); 504 (Jan. 30, 2008); 517 (Mar. 17, 2008); 913 (Mar. 17, 2008); 555 (Mar. 28, 2008).

On February 22, 2008, following plaintiff's submission of a Freedom of Information Act ("FOIA") request probing the Air Force's decision not to recompete the requirements covered by the ARSS contract, representatives of plaintiff and the Air Force met regarding a possible follow-on to the ARSS contract.  Plaintiff alleges that the Air Force stated that "it

---

5/ NWC is part of the 709ARSS/NSS. AR at 752.  See supra note 3.

was not unhappy with [plaintiff's] performance," but that "it was not required to maintain the work that is the subject of the ARSS Contract as a small business set-aside." Compl. ¶ 19. Following another FOIA request, the parties met on March 19, 2008. Plaintiff alleges that the Air Force had a legal obligation to continue this procurement through the small business set-aside program. The Air Force disagreed, explaining that the ARSS requirements had changed. According to plaintiff, this was the first notice by the Air Force that change-of-circumstances prompted the decision not to solicit a follow-on contract. Id. ¶ 21.

By e-mail dated March 17, 2008, Capt. James D. Norman, Chief, Combating Weapons of Mass Destruction ("WMD") Operational Support Branch for the Air Force's 709th Nuclear Systems Squadron ("NSS") and Program Manager, sent Contracting Officer Lindom; Tammie L. Johnson, Director of AFRL contracting; and Roger Shinnick, Division Chief at AFRL contracting, a "Point Paper," which discussed the NSS's changed requirements "from the previous contract (Rhino) to the future contract (DTRIAC)." AR at 915. The subject of the e-mail read "Information requested at Meeting." 6/ Id.

The Point Paper provided a brief discussion of reasons why the NSS should let the ARSS contract expire and recommended against re-soliciting the services provided under the ARSS contract. First, Capt. Norman listed the four contracts that support the NSS, which included those of plaintiff and ITT-AES. Next, he recapitulated the services that plaintiff provides: "'Advisory & Assistance Services (A&AS)-like' support with in-house technical and administrative personnel. Additionally, they provide technical assessments, studies, analyses and test support through a variety of sub-contractors - 709 ARSS is the COTR [the Contracting Officer's Technical Representative] for this contract . . . ." AR at 916. Capt. Norman reviewed the NSS's current needs, stating that the NSS is fully staffed and no longer requires A&AS-like services. Given that the NSS was organizationally moving towards utilizing task-based efforts for support, Capt. Norman noted that the NSS could utilize ITT-AES because this contractor already was providing most of the NSS's task-based efforts as the subcontractor to plaintiff. Capt. Norman compared the costs of and the contractors' performance under each contract, finding ITT-AES superior in both categories. Based on those assessments made about plaintiff, ITT-AES, and the NSS's contracting needs, Capt. Norman recommended that the NSS "[a]llow the current RhinCorps [sic] contract to expire in May 2008, do not solicit for continued A&AS services, and utilize existing contracts available to the 709 ARSS to meet new support requirements." AR at 917.

---

6/ The e-mail does not identify the referenced meeting, but it likely was the meeting held on March 19, 2008.

Ms. Johnson replied to Capt. Norman questioning whether plaintiff was ever provided any feedback on its performance.  She recommended that Capt. Norman "beef[] up" his analysis by providing more specifics because the "draft paper is not yet strong enough to defend your decision well but I think you can get there."  AR at 918.

By letter to Secretary of the Air Force dated March 19, 2008, Rep. Heather Wilson questioned why the ARSS contract had been moved to a large business, and whether the ARSS contract could be extended to allow for an issuance of a request for proposals for a follow-on contract.  In its April 17, 2008 response, the Air Force attributed its need for a "highly skilled, technical expertise across a broad spectrum only on an as needed basis" as another justification to redistribute the ARSS contract requirements. 7/ AR at 17.  To allow small business contractors to compete, the ARSS would conduct market research by means of a "Sources Sought Synopsis" (sometimes referred to as the "Sources Sought" or the "SSS") to determine whether a follow-on contract was needed. Plaintiff was encouraged to respond to the Sources Sought Synopsis.

Rep. Wilson replied by letter dated April 22, 2008, requesting the Secretary to respond to the specific inquiries made in her March 19, 2008 letter and posed additional questions about the ARSS contract.  By letter dated May 9, 2008, Col. Randolph P. Miller, United States Air Force, responded to Rep. Wilson reiterating the Air Force's position that due to organizational changes it was "eliminating redundant or unnecessary requirements" and stating that the Air Force's issuance of a Sources Sought Synopsis for remaining requirements of the ARSS contract does not render this position inconsistent.  AR at 35.

---

7/ It appears from an e-mail sent by Tammie Johnson to nine Air Force personnel (including Michael A. Watt, CXD Division Chief for the Air Force's 709th NSS) that there was confusion about which contracting office was involved in the possible small business follow-on contract:

> One of the complicating factors is that there are 3 contracting offices involved here.  None of which believe that they are the primary contracting office for the Nuclear Weapons Center.  Det 8 AFRL/PK manages the current contract with the contractor, 377CONS manages MIPR transactions and other day to day requirements for the NWC, and DTRA hold the contract where we anticipate the new requirements may be placed.

AR at 752.  The e-mail attached a proposed draft letter in response to Rep. Wilson's March 19, 2008 letter, and other e-mails discuss how to best approach the inquiry and word the letter.  Id. at 752-68.

By an internal memorandum dated March 25, 2008, 8/ the Air Force stated that due to internal organizational changes it was able to increase efficiency by sharing resources, such as government personnel and contractors, and thereby eliminate duplicative work.  AR at 11; see also id. at 405-06 (D & F), 573.  The Air Force determined that many of the tasks outsourced to plaintiff would no longer be needed:

> The 709 ARSS needs the flexibility to bring in expertise, as required, but not fund full-time bodies for this support.  Since the organizational mission spans several areas of expertise (nuclear physics, chemistry, biology, mechanical engineering, electrical engineering, structural engineering, conventional explosives, navigation, guidance & control, modeling & simulation, etc. . .), the ability to receive services for specific tasks in which the appropriate personnel can be assigned to work these activities is critical.  Additionally, business practices have changed given the new organizational alignment of the 709 ARSS.  Instead of having dedicated resources to a specific weapon system, business will now be executed using multidisciplinary (cross-system) individuals who can surge across systems to support broad taskings.  This requires a skill set completely different than that currently provided.  This approach, as outlined above, will draw on the skills/expertise of a number of individuals, larger than the annual FTE [full-time employee] requirement . . . .
>
>          . . . .
>
>          . . . It is anticipated that none of the work currently conducted by [plaintiff] (with the exception of the Program Management function, and approximately 1/4 FTE of the SME expertise that they currently provide) would be needed under any contract vehicle.  New work/requirements have been evaluated as all technical, analytical tasks that will be assigned as required.  The nature of these tasks, however, will be similar to those activities historically subcontracted to ITT.

AR at 12-13.  The report then summarized the "Market Research" that had examined entities that potentially could provide needed technical support.  AR at 13.  The report grouped the companies into three categories: Small Businesses; Technical Research Centers; and

---

8/  Although this report itself is not dated, defense counsel correlated the report to a reference in an e-mail dated March 25, 2008 (AR at 923), that corroborates a March 25, 2008 date.  This could be the "beefed-up" version of Capt. Norman's March 17, 2008 report.

Large/Other Companies that Can/Have Supported 709 ARSS.  It was determined that ITT-AES was the only "viable option for 709 ARSS Support."  AR at 14.

By an internal report titled "709 NSS Contracting Update," dated May 22, 2008, 9/ the Air Force specified that, after plaintiff's contract expires on May 29, 2008, its "Immediate Support" strategy is to serve its needs "through existing tasks under the current DTRIAC contract."  AR at 574.  The report also bulleted a number of items labeled as "Current Strategy," which contemplated the repercussions of a "legal injunction" and included plans to issue a Sources Sought evaluating whether two or more small businesses could complete the Air Force's remaining contract requirements.  AR at 575.

On March 31, 2008, Herbert Thompson, CIV BQC, contacted Michael A. Watt, Combating WMD Division of AFNWCA, Division Chief for the Air Force's 709th NSS, by e-mail titled "TAT [Technical Area Task] 63" stating:

> One of the things we are going to have to do is send out a "sources sought" synopsis to determine if there are two or more small businesses that can perform the effort.  I am working on a draft of the synopsis and will contact you tomorrow to discuss.  I will need you to review the capability statements submitted in response to the synopsis, and assess capabilities . . . .

AR at 884.  Mr. Watt later served as one of the three evaluators, who scored the Statement of Capabilities submitted by each of the three small businesses respondents.  He replied on the next date:

> I've attached a paper that describes some of our thoughts as to how we reached the conclusion to press with the DTRA contract - I wanted to provide just to give some info/insight as we go through this process (not to change anything we are doing or imply we have conducted a "sources sought") . . . speaking of which. . .
> - can you give me a quick sketch of what the process is/will be to get this effort on contract?
> - if two or more small businesses are identified, how do we proceed? Will DTRA still support us in acquiring these services or do we need to prep a different contracting office?

AR at 884.

---

9/  The date is handwritten on the cover page of the report.

Beginning on a date several days later, April 4, 2008, the administrative record includes e-mail correspondence received by Mr. Watt from three ITT-AES employees. Plaintiff points to these e-mails as evidence that ITT-AES "participated in the drafting of the Sources Sought Synopsis." Pl.'s Br. filed Apr. 17, 2009, at 9 (citing AR at 885-95). The e-mails discussed ITT-AES's input for a modification of a Technical Area Task intended to be a vehicle to funnel more work for ITT-AES on the DTRIAC Contract. 10/ Defendant disputes this evidence, stating that Mr. Watt received these e-mails from ITT-AES, Capt. Norman drafted the SSS, and no evidence exists that Capt. Norman relied on or used the information in these e-mails to draft the SSS. The court denied a motion by defendant to supplement the administrative record with a new declaration from Capt. Norman and another from Mr. Watts. See Order entered May 11, 2009, as modified on reconsideration (May 18, 2009).

The SSS was posted on May 6, 2008. The SSS stipulated that the contractor should provide "scientific and engineering expertise, code development, technical analyses, modeling, simulation, software support, as well as other technical functions required to support" the five mission areas: 1) Chemical, Biological, Radiological, Nuclear and high-yield Explosive ("CBRNE") Pillars/Mission Areas, AR. at 27; 2) CBRNE and Nuclear Weapons Lethality, id. at 28; 3) CBRNE and Nuclear Weapons Studies, id.; 4) Collaboration and Technical Assessments, id. at 29; and 5) Weapon Testing and Analysis, id. The Air Force provided that the Statements of Capabilities should demonstrate the ability to respond and integrate all mission areas, demonstrate "the ability as the prime to complete fifty percent of the effort for each mission area as well as all areas concurrently and demonstrate how the efforts not supported by the prime will be supported." Id. at 31.

Seeking clarification, plaintiff e-mailed Ms. Lindom on May 12, 2008, questioning what criteria should be used to establish 50% of the effort for each mission area if no specific effort was identified in each mission area, AR at 36, and how the SSS's 50% requirement related to the FAR requirement of 50% of the total contract performance in contrast to 50% of a particular mission area. AR at 38. Ms. Lindom responded on May 16, 2008, stating that the Air Force could not guarantee how much work would be required by each mission area; thus, to determine whether a contractor is capable of performing the work the contractor must demonstrate the ability to meet 50% of each mission area.

---

10/ One of the e-mails from Vern Smith of ITT-AES dated April 7, 2008, referred to "Sources Sought" ("We have the SOW [Statement of Work] for the Sources Sought ready to go."). AR at 890.

Plaintiff commenced this action on June 3, 2008, marshaling an array of charges to indict the Air Force's decision not to solicit small businesses for a follow-on contract to the ARSS contract as contrary to law.  Compl. ¶ 37.  Plaintiff's primary contention was that diverting the duties of the ARSS contract violates FAR 19.502-2(b), which requires contracting officers to set aside acquisitions over $100,000.00 for small business participants upon an agency determination that at least two responsible small businesses would be reasonably expected to submit offers.  Id. ¶ 37(i).  Plaintiff asserted that the transfer of duties was "pretextual" and that the Air Force lacked legitimate motivation for determining not to issue a new solicitation identical to the expired ARSS contract.  Id. ¶¶ 39(a), (b).  Plaintiff leveled the charge that the Air Force did not announce that the ARSS requirements had changed until after plaintiff confronted the Air Force with the "legal authority concerning its obligation to maintain the small business set-aside program represented by the ARSS Contract."  Id. ¶ 39(a).  On June 3, 2008, plaintiff filed suit in the United States Court of Federal Claims for declaratory and injunctive relief, with jurisdiction predicated on 28 U.S.C. §1491(b) (2006), "reversing" the Air Force's decisions not to solicit a follow-on contract and not to extend plaintiff's contract until the determination required by law had been made.  Id. ¶¶ 1, 42.

Responses to the SSS were due on June 4, 2008. [                                                        ], and plaintiff submitted responses. By e-mail dated June 11, 2008, Capt. Norman contacted the Sources Sought panel, Mr. Watt; John Faulkner, Civil AFMC 709, ARSS/SSD; and Maj. Brian L. Foster, AF/A5XP, attaching the responses to the SSS and requesting the panel to evaluate the responses using the Sources Sought Evaluation Form as a guide.  The Sources Sought Evaluation Form stipulated that the "focus of the evaluation was based on two main points. First, is the responded [sic] capable of providing the best technical capability to complete the requirement? Second, if the respondent is able to complete the requirement, is the respondent capable of completing 50% of the requirement as the prime contractor?"  AR at 257.

On July 24, 2008, Ms. Lindom contacted plaintiff by e-mail requesting clarification of the information provided in support of its capability to support a 50% effort in each mission area.  Ms. Lindom posed the same question to [     ] by e-mail of the same date. Plaintiff responded, by e-mail dated July 29, 2008, stating that pursuant to FAR 52.219-14 it believed that its original response met the Air Force's needs, remarking that it was impossible to answer the SSS as requested because the SSS does not identify a specific task distribution.

Ms. Lindom completed the Air Force's "Determination and Findings for the Unilateral Decision to use Full and Open Competition for the 709 Nuclear Systems Squadron (NSS) Counter-proliferation and Nuclear Weapon Requirement" (the "D & F") on October

1, 2008. 11/ AR at 405-07. The D & F concluded in its overall evaluation that plaintiff's personnel did not have the experience necessary to support modeling and simulation activities required by the contemplated contract. The resumes submitted by plaintiff exemplified that its employees lacked "core technical analyses and design qualifications required to support the 709 NSS technical support requirements." AR at 406. The D & F reported that most of plaintiff's employees were technical managers, which complemented an effort no longer required. Similarly, the D & F found [                    ] Statements of Capabilities insufficient. Based on the foregoing, Ms. Lindom determined, "[a]s the Contracting Officer," that she did not have a reasonable expectation that the NSS would receive offers from two or more responsible small businesses. AR at 407. Shortly thereafter, on October 6, 2008, the NSS announced that it planned the acquisition for the 709th NSS requirement as a full and open competition.

This case was transferred to the undersigned pursuant to RCFC 40.1(b) by order dated September 19, 2008. Briefing on defendant's motion to dismiss filed pursuant to RCFC 12(b)(1) and 12(b)(6) had been completed on August 27, 2008. Following an important decision issued by the United States Court of Appeals for the Federal Circuit on August 28, 2008, see Distributed Solutions, Inc. v. United States, 539 F.3d 1340 (Fed. Cir. 2008), this court ordered supplemental briefing to address questions that the briefs did not answer on the issue of subject matter jurisdiction of the Court of Federal Claims.

In defendant's supplemental brief filed on November 17, 2008, defendant offered the D & F as evidence that plaintiff's claims relating to the violation of small business procurement regulations were moot because the Air Force had complied with the requirements of FAR 19.502-2(b), determining that no reasonable expectation existed that the Air Force would receive offers from at least two responsible small businesses. Therefore, Contracting Officer Lindom determined that "[i]t is in the best interest of the government to have full and open competition for this acquisition." AR at 407.

Plaintiff disputed the factual basis for the Air Force's conclusion in the D & F and advanced that this report merely was submitted in an attempt to cover up the fact that the Air Force either failed to initiate timely a small business follow-on process or determined that ITT-AES could perform the services cheaper than a small business.

---

11/ Although the D & F itself is not dated, and the parties have not pointed to any document in the record that refers to the date, the index to the administrative record indicates that the D & F was issued on October 1, 2008. The D & F was first submitted to the court as an attachment to defendant's supplemental brief filed on November 17, 2008.

On January 28, 2009, this court issued an opinion granting defendant's motion to dismiss for lack of subject matter jurisdiction plaintiff's claim for diversion of work from the ARSS contract and otherwise denied defendant's motion. RhinoCorps Co. v. United States, 85 Fed. Cl. 712, 724 (2009) (order granting, in part, motion to dismiss), withdrawn and reissued (May 15, 2009), slip op. at 17. Defendant's motion to dismiss plaintiff's claim on the merits was denied because plaintiff had pleaded sufficient facts to establish that the Air Force's D & F, in fulfillment of FAR 19.502-2(b), was unreasonable. Id.

An order entered on February 10, 2009, following a scheduling conference held that date, called for simultaneous briefing on cross-motions on the administrative record to be completed on May 18, 2009.

On March 25, 2009, at the request of plaintiff, the court held a telephonic status conference to discuss developments that had taken place in the subject procurement since the court's last involvement on February 10, 2009. On the same date, plaintiff filed an Amendment to and Renewal of Application for Temporary Restraining Order and Preliminary Injunction. Plaintiff had learned on March 5, 2009, that the Solicitation for the NSS procurement had been issued. See Supplemental Affidavit of Ross L. Crown, Mar. 31, 2009, ¶ 7. By order entered on March 26, 2009, the court ordered expedited briefing on plaintiff's renewed motion for interim injunctive relief. On February 23, 2009, the Air Force issued Solicitation No. FA9453-09-R-0001 (the "Solicitation") for full and open competition for the procurement of services for the 709th NSS Counterproliferation and Nuclear Weapon requirement (the "NSS procurement"). The Solicitation specified that all proposals must be received no later than March 25, 2009, at 12:00 p.m. M.D.T.

On April 7, 2009, after briefing and argument, this court granted plaintiff's Amendment to and Renewal of Application for Temporary Restraining Order and Preliminary Injunction, filed on March 25, 2009, as supplemented on March 31, 2009, enjoining the Air Force from evaluating any offer submitted in response to Solicitation No. FA9453-09-R-0001 pending the entry of an order on plaintiff's complaint for a permanent injunction. RhinoCorps Co. v. United States, 86 Fed. Cl. 642, 2009 WL 961215, at *6 (Apr. 7, 2009), withdrawn and reissued (May 15, 2009), slip op. at 9-10.

In lieu of responding to plaintiff's renewed motion, defendant, on April 2, 2009, filed Defendant's Motion To Dismiss and Stay Further Briefing Pending the Court's Decision Regarding Defendant's Motion To Dismiss. Defendant advised that the Air Force had decided to take voluntary corrective action to withdraw the D & F. An accompanying affidavit of Contracting Officer Lindom dated April 1, 2009, described the proposed corrective action as reexamining the results of the market research, including reviewing the

previously submitted Statements of Capabilities; reassessing the evaluations of the evaluation panel; and issuing a new D & F.

The April 7, 2009 Order also denied defendant's motion to dismiss on the grounds that plaintiff had standing and that plaintiff's complaint was not mooted by issuance of the D & F. The proposed corrective action amounted to a review and rewrite of materials before the contracting officer when she issued her D & F. Defendant already had supplemented the administrative record with Ms. Lindom's declaration dated March 27, 2009, and that of Capt. Norman dated March 26, 2009, explaining his role in the D & F. Defendant could point to no justification for a fuller explanation consistent with the rule that a party may be allowed to supplement the administrative record to adequately explain the record before the court. The contracting officer did not identify any impropriety that she sought to correct, nor could defendant substantiate what action was to be deemed corrective. See Chapman Law Firm Co. v. United States, 71 Fed. Cl. 124, 130 (2006) (requiring identification of impropriety and explanation of proposed plan), aff'd in part and rev'd and remanded on other grounds, 490 F.3d 934 (Fed. Cir. 2007).

Because the contracting officer in her April 1, 2009 affidavit did not propose to do anything different or to request any additional submissions – merely to reevaluate preexisting record materials – the court denied defendant's motion to dismiss and stay as unreasonable under the circumstances. See RhinoCorps, 86 Fed. Cl. 642, 2009 WL 961215, at *7, withdrawn and reissued (May 15, 2009), slip op. at 10. Plaintiff's motion for summary judgment filed on April 6, 2009, was also denied without prejudice to presenting its arguments on plaintiff's cross-motion for judgment on the administrative record. Id.

Briefing on the cross-motions on the administrative record was completed on May 11, 2009. Before argument on May 13, 2009, defendant filed a motion to strike the Declaration of Anthony J.D. Contri, May 4, 2009, and the Affidavit of Joseph M. Pappe, May 4, 2009, appended to plaintiff's motion filed on May 4, 2009, which the court rules on without further briefing. See RCFC 7.2(a).

## DISCUSSION

I. Jurisdiction

The United States Court of Federal Claims derives jurisdiction over bid protests from the Tucker Act, 28 U.S.C. § 1491(b)(1), amended by the Administrative Disputes Resolution Act of 1996, Pub. L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"). Specifically, the Court of Federal Claims has jurisdiction over actions by an "interested party" objecting to: (1) a solicitation by a federal agency for bids or proposals for a proposed contract; (2) a proposed award or the award of a contract; or (3)

any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement.  28 U.S.C. § 1491(b)(1).  Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  The court may "award any relief that the court considers proper, including declaratory and injunctive relief."  28 U.S.C. § 1491(b)(2).

II.  Standing

Every plaintiff must have standing to invoke the court's jurisdiction over a bid protest. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("the party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]").  28 U.S.C. § 1491(b)(1) provides, in pertinent part:  "[T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals . . . ."  The pivotal element of standing in a bid protest is whether a protester qualifies as an "interested party" under § 1491(b)(1). See Am. Fed'n of Gov't Emp. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("AFGE") (holding that "interested party" under Tucker Act is construed in accordance with Competition in Contracting Act, 31 U.S.C. § 3551(2) (2006)).

The Federal Circuit defines "interested party" in § 1491(b)(1) as "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract [by the Government]."  Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (internal quotation marks and emphasis omitted) (quoting AFGE, 258 F.3d at 1302).  This statutory definition imposes a two-part burden to establish standing: (1) plaintiff must show that it is an actual or prospective bidder, and (2) plaintiff must show that it possesses a direct economic interest. Rex Serv. Corp., 448 F.3d at 1307.

The court has ruled that plaintiff has standing as an interested party.  See RhinoCorps, 86 Fed. Cl. 642, 2009 WL 961215, at *4 (Apr. 7, 2009), withdrawn and reissued (May 15, 2009), slip op. at 6; see also RhinoCorps, 85 Fed. Cl. 712, 721, 724 (2009), withdrawn and reissued (May 15, 2009), slip op. at 13, 17.

III.  Motion for judgment on the administrative record

1.  Standard of review

To obtain permanent injunctive relief, a protester must prove either that the agency acted arbitrarily or capriciously or that it prejudicially violated an applicable procurement regulation.  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ("Domenico Garufi") (discussing cases based on Scanwell Labs. Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970)).

The ADRA's standard of review for agency procurement decisions mirrors the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA"). See 28 U.S.C. § 1491(b)(4); Banknote Corp., 365 F.3d at 1350. The APA gives the court discretion to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see PGBA LLC v. United States, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief); see also Domenico Garufi, 238 F.3d at 1332-33. However, establishing that an agency violated the APA standard of review does not entitle a protestor to relief; the error must also be prejudicial. 12/ Galen Med. Assoc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (clarifying that, in addition to significant error in procurement process, plaintiff must show that error was prejudicial (citing Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).

Accordingly, the Federal Circuit applies a two-step analysis for bid protests: first, the court must determine whether the Government acted without a rational basis (whether the action was arbitrary or capricious), see Domenico Garufi, 238 F.3d at 1332; or whether the Government acted contrary to law (whether the Government action constituted a prejudicial violation of an applicable procurement regulation). In either case a plaintiff bears the heavy burden of proving a lack of rational basis or a violation of the law. Id. at 1333. Second, if

---

12/  The Federal Circuit has held that "the question of prejudice goes directly to the question of standing . . . [and that] 'prejudice . . . is a necessary element of standing.'" Info. Tech. & App. Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting Myers Investigative and Sec. Servs. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002)). Although the prejudice requirement for standing has been satisfied by a nominal showing that a protester "could compete for the contract," Myers, 275 F.3d at 1370, the prejudice requirement required for success on the merits consistently has been more stringent. See TipTop Constr., Inc. v. United States, No. 2008-5183 (Fed. Cir. Apr. 29, 2009) (no prejudice when contracting officer gave alternative ground for decision that was upheld); Galen Med. Assoc. v. United States, 369 F.3d 1324, 1330-31 (Fed. Cir. 2004) (denying existence of prejudice when proposal did not have requisite facilities required by solicitation); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1563 (Fed. Cir. 1996) (prejudice not found when, despite pricing error, protestor's prices remained substantially higher). In essence, these are incongruent, although slightly overlapping, standards. See generally Textron, Inc. v. United States, 74 Fed. Cl. 277, 284-85 & n.3, 329-30 (2006) (summarizing Federal Circuit caselaw); cf. Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (holding that both standards can be satisfied with same demonstration of "substantial chance" of receiving award but for alleged error).

the government action lacked a rational basis, a factual inquiry must be conducted to determine whether the protester was prejudiced by the conduct. See Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

Agency action is arbitrary or capricious when it does not have a rational basis for its decision. A rational basis requires "the contracting agency [to] provide[] a coherent and reasonable explanation of its exercise of discretion." Domenico Garufi, 238 F.3d at 1333 (internal quotations and citation omitted). The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute judgment for the agency; indeed, the agency generally is accorded wide discretion in evaluating bids, and the court should not substitute its judgment for that of the agency. Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (stating that courts should review facts to determine if agency's decision is supported by rational basis).

2. Burden of proof

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1. This rule provides a procedure allowing the court to expedite a trial by using a "paper record" to conduct fact finding. Bannum, 404 F.3d at 1356. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. Id. The parties are restricted to the agency record and any

supplementation consistent with RCFC 52.1. 13/ Findings of fact made by the court are

_____

13/ During the volley of motions to supplement the administrative record and motions to strike affidavits and declarations submitted with the parties' briefs, the Federal Circuit issued <u>Axiom Res. Mgmt, Inc. v. United States</u>, __ F.3d __, 2009 WL 1175510 (Fed. Cir. May 4, 2009). <u>Axiom</u> allowed supplementation of the administrative record "only if the existing record is insufficient to permit meaningful review consistent with the APA." <u>Axiom</u>, 2009 WL 1175510, at *5. The court decoupled this standard from the eight exceptions to the rule restricting review to the record submitted by the agency set forth in <u>Esch v. Yeutter</u>, 876 F.2d 976, 991 (D.C. Cir. 1989): "[I]nsofar as Esch departs from the fundamental principles of administrative law as articulated by the Supreme Court in Pitts and *Florida Power & Light* [*Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)], it is not the law of this circuit." <u>Id.</u>

As certain of the <u>Esch</u> exceptions have guided the conduct of bid protests in the Court of Federal Claims since 1996, this court understands that the following are still viable and that the administrative record may be supplemented:

> (1) when the agency action is not adequately explained in the record before the court;
> (2) when the agency failed to consider factors which are relevant to its final decision;
> (3) when an agency considered evidence which it failed to include in the record;
>
> . . . .
>
> (8) in cases where relief is at issue, especially at the preliminary injunction stage.

<u>Esch</u>, 876 F.2d at 991. Each of the first three contemplates addition to the administrative record of material that the invitation for bids or solicitation required.

Regarding the last item, a bid protest brought in the Court of Federal Claims contemplates that the record before the court will include post-agency-action evidentiary submissions. A court cannot give due regard to the interests of national defense and national security without accepting a declaration or affidavit from a responsible official. 28 U.S.C. § 1491(b)(3). A court cannot examine agency actions that are assailed as a conflict of interest, bias, or other extra-legal activity without considering evidence that was not before

consistent with those that would be made during trial.  Id. at 1357.

Plaintiff must establish its entitlement to permanent injunctive relief by satisfying four criteria.  The Federal Circuit requires: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Group, Inc. v. United States, 554 F.3d 1029, 1037 (2009).  See generally eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). 14/

---

13/  (Cont'd from page 16.)

the agency when the administrative decision was made.  Nor can a court evaluate the parties' factual showings regarding the three equitable findings for injunctive relief without accepting post-agency-action evidentiary submissions.  This court therefore does not interpret the new guidelines in Axiom to change the trial court's practice, other than to emphasize restraint and adherence to precedent.

14/ On April 7, 2009, this court granted a preliminary injunction pending issuance of the opinion and order issued this date on the parties' cross-motions for judgment on the administrative record.  See RhinoCorps, 86 Fed. Cl. 642, 2009 WL 961215, at *6, withdrawn and reissued (May 15, 2009), slip op. at 9-10.  The court relied on FMC Corp. v. United States, 3 F.3d 424, 426-27 (Fed. Cir. 1993), in weighing the three equitable factors more heavily than likelihood of success on the merits.  Defendant had not filed an opposition to plaintiff's renewed motion for preliminary injunction, but filed a motion to dismiss and stay, which the court denied.  Absent any joining of the issue on the merits, the court merely described the problems highlighted to date with the D & F.  On reflection, this court considers that FMC Corp. no longer has currency insofar as it stands for the proposition that no one factor is dispositive and that the weakness of one factor may be overborne by the strength of others.  See 3 F.3d at 427; see also Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1364 (Fed. Cir. 2008) (stating "equitable factors are of particular significance at the preliminary stage").

A later decision of the Federal Circuit in Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (2001), states that both the first two factors must be satisfied, i.e., likelihood of success on the merits and irreparable harm, before a preliminary injunction can issue.  FMC Corp. does not pose a direct conflict with Amazon.com, such that FMC Corp. would stand as the controlling precedent, see Newell Companies v. Kenny Mfg. Corp., 864 F.2d 757, 765 (Fed. Cir. 1988).  However, Amazon.com represents a consensus view in patent cases, affirmed as recently as May 14, 2009.  See Altana Pharma A.G. v. Teva Pharm.

17

IV.  Reasonableness of the D & F and the Air Force's compliance with
       applicable procurement regulations

Plaintiff must prove that the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  28 U.S.C. § 1491(b)(4) (adopting standard of 5 U.S.C. § 706(2)(A)).  Therefore, plaintiff has the burden of proving either that the Air Force acted without a rational basis when it decided not to solicit a small business set-aside or it must show "a clear and prejudicial violation of applicable statutes or regulations." Domenico Garufi, 238 F.3d at 1333 (internal quotations and citations omitted).  In addition, plaintiff must establish that the Air Force's actions prejudiced it.  "[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct."  Bannum, 404 F.3d at 1351.

The overarching issue in this case is whether the Air Force complied with the requirements of FAR 19.502-2(b) when determining not to solicit a small business follow-on contract.  Defendant submits that plaintiff has failed to show that the Air Force has acted arbitrarily, capriciously or in violation of any law; moreover, what the record demonstrates, according to defendant, is the Air Force's full compliance with FAR 19.502-2(b) "because it undertook the required small business analysis prior to issuing the solicitation at issue as full and open competition."  Def.'s Br. filed Apr. 17, 2009, at 6.

Plaintiff rejoins that the Air Force did not make the required determination before deciding to issue the work to ITT-AES, and it was not until after plaintiff prodded the Air Force about the legality of its actions that the Air Force proceeded to issue the SSS. Moreover, plaintiff was prejudiced because the "untimely analysis conducted by the Air Force contributed to the production of an unreasonable D&F. . . . [T]he D&F was assembled to justify the Air Force's prior decision to abandon the small business set-aside program

_____

        14/   (Cont'd from page 17.)

Indus. Ltd., __ F.3d ___, 2009 WL 1332741, at *4 (Fed. Cir. May 14, 2009) (citing Amazon.com, 239 F.3d at 1350).

On this basis the more prudent course is to memorialize on the record that the preliminary injunction was entered on the grounds 1) that defendant's challenge to the preliminary injunction was based on standing and mootness and that plaintiff overcame those objections; 2) that defendant did not brief its opposition to plaintiff's showing of success on the merits; and 3) that plaintiff made a compelling showing on the equitable considerations.

without considering whether at least two responsible small businesses could perform a follow-on contract." Pl.'s Br. filed May 4, 2009, at 8. Consequently, the small business program was eliminated, as was plaintiff's opportunity to compete for a follow-on contract that plaintiff argues it had a substantial chance of being awarded.

Plaintiff presents five arguments against the reasonableness of the D & F and the Air Force's professed compliance with applicable procurement regulations. First, plaintiff cites the D & F as unreasonable because it is a product of an organizational conflict of interest ("OCI"). See FAR Part 9, subpart 9.5 (Organizational and Consultant Conflicts of Interest). Plaintiff next argues that the Air Force improperly used the 50% rule promulgated by FAR 52.219-14(b)(1), which addresses limitations on subcontracting, discounting this provision as "wholly irrelevant to this stage of an acquisition." Pl.'s Br. filed Apr. 17, 2009, at 23. Furthermore, plaintiff maintains that, even if the Air Force properly considered FAR 52.219-14(b)(1) at this stage in the procurement process, the contracting officer made a nonresponsibility determination and should have referred the matter to the SBA for a possible Certificate of Competency ("COC") under FAR 19.601. Fourth, plaintiff elaborates that the Air Force prematurely invoked the 50% rule. Because the NSS's requirements were not known and not clearly defined before the NSS Solicitation issued, any evaluation of plaintiff's responsibility to perform 50% of the effort was speculative and therefore unreasonable. Finally, plaintiff contends that the Air Force lacked a rational basis for finding that plaintiff could not meet this 50% subcontracting limitation.

### 1. Organizational conflict of interest

Plaintiff extrapolates from several e-mails received by Mr. Watt from ITT-AES evidence that ITT-AES was "instrumental in the drafting of the" SSS. Pl.'s Br. filed Apr. 17, 2009, at 20. 15/ Plaintiff insists that these e-mails should be considered in light of the

---

15/ Defendant seeks to dismiss plaintiff's OCI argument because it was not raised in its initial complaint. Def.'s Br. filed May 4, 2009, at 5 (citing Crest A. Apartments, Ltd. v. United States, 52 Fed. Cl. 607, 613 (2002) (precluding plaintiff from raising claims for first time during summary judgment because plaintiff had ample opportunity to amend complaint and discovery order limited issues to those raised in complaint)). Crest is distinguishable. Defendant has been reminded previously that the complaint preceded issuance of the D & F. Any challenges to the D & F ipso facto require that the complaint be deemed amended to reflect them. See e.g., RhinoCorps, 85 Fed. Cl. at 721, withdrawn and reissued (May 15, 2009), slip op. at 13.

Air Force's desire to direct the work that plaintiff previously performed to ITT-AES. Plaintiff imputes to ITT-AES every motive to assist in the drafting of the SSS as a means to limit the number of small businesses that could successfully respond to the SSS.

Defendant cites to FAR 9.505-2(b)(1) for support, which states:

> If a contractor prepares, or assists in preparing, a work statement to be used in competitively acquiring a system or services--or provides material leading directly, predictably, and without delay to such a work statement--that contractor may not supply the system, major components of the system, or the services unless--
> (i) It is the sole source;
> (ii) It has participated in the development and design work; or
> (iii) More than one contractor has been involved in preparing the work statement.

Defendant relies on this provision to underscore that plaintiff has not demonstrated or alleged that the content of the e-mails lead "directly, predictably, and without delay" to the SOW contained in the SSS.  Def.'s Br. filed May 4, 2009, at 5.

Plaintiff counters that an OCI can arise from a number of circumstances, including the preparation of a SOW by a contractor.  See FAR 9.505-2.  According to plaintiff, a common OCI arises in cases, such as the one at bar, where one contractor's involvement "has . . . set the ground rules for another contract by, for example, writing the statement of work or specifications." Ala. Aircraft Indus. Inc. v. United States, 83 Fed. Cl. 666, 687 (2008)

---

15/ (Cont'd from page 19.)

The D & F did not exist when plaintiff filed its complaint and was not provided to plaintiff, or the court, until defendant filed its supplemental brief on November 17, 2008. Following the issuance of the D & F, the general claim made by plaintiff attacking the reasonableness of the Air Force's decision not to solicit a small business set-aside developed with more precision, and, predictably even more so, following the filing of the administrative record.   The OCI claim is merely another argument made by plaintiff attacking the reasonableness of the D & F and the Air Force's compliance with applicable procurement regulations, i.e., the Air Force's justification for not soliciting a small business follow-on contract. Defendant is not in any manner prejudiced by consideration of this argument based on the administrative record.

(citations omitted).  The principal concern is whether the involved contractor tilted the competition in favor of itself, thereby gaining a competitive advantage.  Id.

All of the referenced e-mails contained in the administrative record 16/ were sent by ITT-AES to Mr. Watt; indeed, any communication on point that Mr. Watt may have made with ITT-AES was not cited by counsel.  17/  Plaintiff makes a strong argument that the chronology of this case, coupled with a comparison of the e-mails relating to the SSS, indicates some involvement by ITT-AES in the drafting of the SSS.  See Pl.'s Br. filed Apr. 17, 2009, at 20 (citing AR at 885-89 and 26-33).  In support of this position, plaintiff highlights several events that occurred between April and May 2008.  On April 4, 2008, ITT-AES sent several e-mails to Mr. Watt listing several "unique tasks" (which read more like general statements), some of which are similar to the language in the SSS, AR at 885-89; second, on April 7, 2008, ITT-AES sent Mr. Watt an e-mail stating the following:

> Talking Points with Ken Harsha [otherwise unidentified in record] for Mike Watt and Col Daul.
> a. We have the SOW for the Sources Sought ready to go.
> b. However, before sending it we wanted to continue or dialogue regarding the TAT 168 situation.
> c.  It is not our intent to take work away from Rhino Corps.
> d. Our requirements have changed and are documented with AFRL contracts.
> e. We require much more broad scope of technical work.
> f. Our mission is heavily dependant upon SERPENT methodology.
> g. We no longer require administrative and programmatic work.
> h. We have a civil service administrative specialist coming to the 709th.
> i. The current situation is causing our mission to suffer.

---

16/   The court disclaims familiarity with each page of this large, disjointed, non-chronological administrative record.  The court has reviewed it, short of serving as a third advocate in this litigation, but has relied on guidance of counsel to specific and pertinent entries.

17/  Defendant noted during oral argument that neither the administrative record nor plaintiff's proffers show that Mr. Watt solicited the information in the e-mails sent by ITT-AES.  However, as plaintiff also pointed out, the content of the e-mails evidences that Mr. Watt communicated with ITT-AES, albeit the medium is unknown, and these e-mails refer to an ongoing communication between the parties.  See, e.g., AR at 885 ("Mike, Will these help?"); 892 ("Mike, A lot has been happening.  I sent you two emails.  I was wondering how you felt about them. They are repeated at the bottom of this email.  Feel free to call me on my cell anytime tonight. It might be more convenient for you than at work.").

j. We know that RhinoCorps has been in to see DTRA.
We now want to give you the other side of the story and discuss some options.
1. Have the TAT 168 RFP to ITT specify a small business requirement to cover the work that RhinoCorps is currently performing.
2. Finish TAT 168 with the agreement that the 709th will create a small business set-aside to cover the work that Rhino Corps is currently performing . . . .

AR at 890.  On May 6, 2008, the SSS was issued.  By e-mail dated June 11, 2008, Capt. Norman contacted the Sources Sought panel, which included Mr. Watt as one of the technical evaluators.

The inclusion of these e-mails in the administrative record crystallizes an initial question: if these e-mails are not relevant to the SSS at issue in this litigation, why is this one-way communication included in the record?  Defendant, during oral argument, represented that plaintiff asked defense counsel to include in the record any communication by the Air Force with ITT-AES that referenced "small business."  This certainly goes beyond the twenty-one types of information included in RCFC App. C, VII "The Content and Filing of the Administrative Record" ¶ 22(a)-(u).  While not exclusive, all but one item of this suggested listing restrict themselves to the procurement action under review.  18/

---

18/  Appendix C, VII ¶ 22(u) listing "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement" is a misleading description and raises more questions than it answers.  The record under review is the record presented by the agency decision-maker.  <u>Florida Power & Light</u>, 470 U.S. at 743-44 (cited in <u>Axiom</u>, 2009 WL 117550, at *5.)  Judicial review is limited to the record actually before the agency.  <u>Axiom</u>, 2009 WL 117550, at *5.

The record of prior administrative protests, for example, frequently contains post-agency-decision submissions that are called for by the administrative decision-maker.  None of these materials properly can be considered part of the agency decision on review.  While this court notes the recent discussion by Judge Charles F. Lettow in <u>Holloway & Co. v. United States</u>, No. 09-53C, slip op. at 12-13 (Fed. Cl. May 14, 2009), justifying the App. C, VII ¶ 22(u) provision, this court respectfully disagrees with the observation, "It would be strange for this court to be addressing a protest on a more truncated record than that which had been before the GAO [the Government Accountability Office]."  <u>Id.</u> slip op. at 13.  This might be an overstatement.  It would be strange if the Court of Federal Claims would allow supplementation with the type of informal post-hoc statements that the GAO allows.  Materials generated in an administrative protest always can be cited in a judicial proceeding as admissions or inconsistent positions, but they do not "supplement" the administrative record.

A review of the record does not substantiate the allegation that ITT-AES was involved in the drafting of the SOW for the SSS.  The parallels drawn from contrasting the e-mails with the SSS are revealed in similar phrasing, terms, and Air Force argot.  Compare AR at 26 with AR at 885-89.   These similarities must be viewed within the history of the procurement: plaintiff, through the ARSS contract, and ITT-AES, through the DTRIAC contract, essentially performed the same work under their respective contracts; ITT-AES worked as a subcontractor for plaintiff; and ITT-AES was performing work diverted from the ARSS contract that was "substantially the same as the statement of work for the ARSS Contract," since late December 2004, Compl. ¶ 13; see also (Second) Declaration of Capt. James D. Norman, Apr. 16, 2009,  ¶ 3.  Plaintiff concedes this point in its Statement of Capabilities, which gave examples and prefaced its capabilities by the experience it had acquired in each mission area through the work performed during the ARSS contract.  AR at 115-16.

Resolution in favor of plaintiff on this issue would require the court to infer too many hard facts.  In CACI, Inc. v. United States, 719 F.2d 1567, 1581-82 (Fed. Cir. 1983) (reversing the trial court's grant of permanent injunction), the Federal Circuit explained:

> the possibility and appearance of impropriety is not supported by the record and therefore is not a proper basis for enjoining award of the contract.  The Claims Court based its inferences of actual or potential wrongdoing by the Department on suspicion and innuendo, not on hard facts.  The kind of inquiry and analysis the Claims Court made in this case, which without factual basis ascribed evil motives to four members of the Technical Evaluation Committee in their handling of bids, was clearly erroneous and did not justify an injunction against the government's award of the contract . . . .

The presence in the administrative record of these documents neither justifies supplementing the record to refute them (the court denied defendant's motion to supplement with another declaration of Capt. Norman and that of Mr. Watts by order entered on May 11, 2009, modified on reconsideration (May 18, 2009)), nor allowing plaintiff the opportunity to examine these witnesses or obtain other documents to challenge the factual assertions of Capt. Norman and Mr. Watts, were their additional evidentiary submissions allowed.  In short, nothing in the administrative record beyond conjecture opens this matter to further examination.

2.  Application of the 50% rule under FAR 52.219-14

The SSS required a respondent to demonstrate that it could perform 50% of the requirements itself.  Ms. Lindom's D & F states the following:

5.  The senior leadership of the 709 NSS conducted an analysis to determine if there were potential small businesses that could successfully perform these new requirements in compliance with FAR 52.219-14, Limitation on Subcontracting, which requires at least 50% of the cost of contract performance incurred for personnel shall be expended for employees of the small business.  They concluded that there were no small businesses that possessed adequate resources in the breadth of technical disciplines required by the 709 NSS.

AR at 406.  Plaintiff argues that the contracting officer improperly and unreasonably utilized FAR 52.219-14 and applied the 50% rule in making the determination that there is not a reasonable expectation that two or more small businesses would submit offers for a solicitation.

FAR 52.219-14 provides, in relevant part:

(b)  By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for--
(1) Services (except construction). At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

Defendant responds that FAR 52.219-14 would be included in any contract award because the limitation on subcontracting is a material term of a small business contract.  As a consequence, defendant argues, the Air Force properly considered the limitation on subcontracting in evaluating the Statements of Capabilities because it was assessing whether small businesses could satisfy the material terms of the procurement and submit "technically acceptable offers."  Def.'s Br. filed May 4, 2009, at 8.  The Air Force anticipated that some of its technical support would be made on an as-needed and short-term basis, sometimes within hours or days, as substantiated by Capt. Norman.  See (First) Norman Declaration Mar. 26, 2009, ¶ 12.

In citing to Chapman Law Firm v. United States, 63 Fed. Cl. 519, 527 (2005), aff'd in part and rev'd and remanded in part on other grounds, 490 F.3d 934 (Fed. Cir. 2007), for support, defendant urges the court to view the 50% rule as a technical requirement that plaintiff show its personnel with the requisite skills and experience to meet the Air Force's requirements on a sometimes as-needed and short-term basis.

In Chapman the court found the following proposition to be instructive:

As a general matter, an agency's judgment as to whether a small business offeror will comply with the subcontracting limitation is a matter of responsibility, and the contractor's actual compliance with the provision is a matter of contract administration. However, *where a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation, we have considered this to be a matter of the proposal's technical acceptability*; a proposal that fails to conform to a material term and condition of the solicitation, such as the subcontracting limitation, is unacceptable and may not form the basis for an award.

63 Fed. Cl. at 527 (quoting Coffman Spec., Inc., B-284546, B-284546.2, 2000 WL 572693, at *4 (Comp. Gen. May 10, 2000). Chapman is distinguishable because the technical evaluation of proposals was undertaken after a solicitation. However, defendant's point is well taken in the context of an agency's determining whether it is reasonable to expect responsible small businesses to submit offers.

Defendant thus takes the position that it was appropriate for the Air Force to include the limitation on subcontracting in its preliminary analysis under FAR 19.502-2. According to defendant, the specific, as-needed tasks, although undefined, did not prevent the Air Force from properly performing this preliminary analysis because the nature of the specific work requirements was specified, and as-needed support could require the respondents to demonstrate that they themselves were capable of filling the entire range of requirements. The evaluators reasonably could glean this information under FAR 19.502-2(b) by having the respondents identify the skills of their employees and not their subcontractors.

The SSS bulleted a number of required skills spanning across "[a] broad range of technical levels across the following engineering and science fields" that respondents should demonstrate that they could provide: "Microbiology; Chemistry; Biology; Operations research; Geology; Aerospace engineering; Mechanical engineering; Electrical engineering; Physics; Civil Engineering; Computer Engineering; Nuclear Engineering; Computer Science; Materials Science." AR at 30-31. The SSS also enumerated specific expertises that the NSS would need for the set-aside, such as expertise in "neutralization methodologies & tools for chemical compounds to include bulk neutralization techniques" and in "nuclear weapon design, analysis, effects, and assessments." Id. at 30.

Defendant finds support in the record from a request for clarification from Contracting Officer Lindom sent to plaintiff on July 24, 2008, asking for the qualifications and a matrix that facilitated plaintiff's response:

25

> We request that you provide clarification of the information provided in the area of relevant experience and ability to perform a minimum of 50% of the effort. To help clarify the Statements of Capabilities submitted, request that you fill out the attached table detailing the qualifications, education, and experience of the personnel submitted in your Statement of Capabilities.

AR at 42. Plaintiff's July 29, 2008 response stated that its original answer "meets the FAR 52.219-14 requirements." Id. at 44. Plaintiff advised that, unless the Air Force is more specific about the task distribution in each mission area, it cannot answer the question more thoroughly. Id.

The Air Force provided plaintiff with a specific request. Plaintiff's response, however, sought to substitute its concept of what the Air Force needed to satisfy the anticipated procurement, i.e., a breakdown by task, rather than the information specified. The manner in which the Air Force assesses its technical needs lies within its own discretionary domain. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed Cir. 1996) (stating, in the context of a negotiated procurement, that "the minutiae of the procurement process in such matters as technical ratings[ ], . . . involve discretionary determinations of procurement officials that a court will not second guess").

Plaintiff continues that, even if the Air Force's nonresponsibility determination was not premature and was properly made, Ms. Lindom should have referred plaintiff to the SBA for a possible COC, pursuant to FAR 19.601(d). In contrast, defendant characterizes the determination made by Ms. Lindom as a preliminary determination under subpart 19.5 of the FAR. FAR 19.601(d) provides that "[w]hen a solicitation requires a small business to adhere to the limitations on subcontracting, a contracting officer's finding that a small business cannot comply with the limitation shall be treated as an element of responsibility and shall be subject to the COC process. . . ." (Emphasis added.) The first observation made when reviewing FAR 19.601 is that section (d) plainly refers to nonresponsibility determinations following the issuance of a solicitation for a small business concern. Moreover, when faced with a similar issue on appeal, the Federal Circuit made this distinction, finding that FAR 19.602-1 applies to an award that already has been set aside for a SBA program. Blue Dot Energy Co. v. United States, 179 Fed. App'x 40, 46 (Fed. Cir. 2006) (unpublished). This unpublished opinion is not cited as precedent; however, the Federal Circuit has indicated its view. See Fed. Cir. R. 32.1(d) (stating that "[t]he court may refer to a nonprecedential disposition in an opinion or order and may look to a nonprecedential disposition for guidance or persuasive reasoning, but will not give one of its own nonprecedential dispositions the effect of binding precedent"). The initial determination of whether to set aside the contract is made by the Air Force and not one that requires referral to the SBA. Id.

The facts and issues addressed in <u>JT Construction</u>, No. B-254257, 1993 WL 505803 (Comp. Gen. Dec. 6, 1993), provide a comparable situation.  The potential bidder in <u>JT Construction</u>, a small disadvantaged business ("SDB"), responded to a synopsis advertised by the Air Force to determine whether two or more responsible SDBs would submit an offer for a contract to renovate military family housing units.  The protestor argued that the requirements specified in the synopsis were "far in excess" of what is needed for the contracting officer to reasonably determine whether to set-aside the contract for a SDB.  <u>Id.</u> at *2 (<u>citing</u> Defense Federal Acquisition Regulation Supplement 48 C.F.R. § 219.502-2-70 (1993)).  The protestor also added that its response fully addressed the specified requirements; the Air Force's determination that it would not receive offers from at least two responsible SDB concerns was "a premature impermissible determination of nonresponsibility without referral of the determination to the" SBA.  <u>Id.</u>

The GAO responded that it generally views such determinations as a business judgment and within the contracting officer's discretion.  <u>Id.</u>  Nevertheless, the contracting officer has a duty to make a reasonable effort in ascertaining information to assist in making this determination.  The GAO found the inquiry made by the Air Force to be reasonable, considering that the Air Force is obligated to make an affirmative determination under the FAR and given that the contract was for a renovation project that had an estimated cost of $5 to $10 million.  <u>See id.</u> at *3.  The GAO also found, in response to the protestor's assertion that it submitted sufficient evidence for the Air Force to assess its financial status, that the synopsis provided clear instructions on what information was required in order to assess responses.  Finally, the GAO faulted the protestor for failing to distinguish between a determination of whether two or more responsible SDBs will submit an offer and one whereby an offeror is not considered responsible to perform a contract.  <u>Id.</u> at *4 (citation omitted).  In the former, the Air Force is making a pre-solicitation determination about the responsibility of potential bidders, whereas the latter determination precludes a potential awardee from receiving a contract.  <u>See id.</u>  It is the possible preclusion of a putative small-business awardee for failure to satisfy the 50% subcontracting limitation that must be referred to the SBA.

The Air Force's requirement in the SSS is that plaintiff "[c]learly demonstrate the ability as the prime to complete fifty percent of the effort for each mission area as well as all areas concurrently and demonstrate how the efforts not supported by the prime will be supported," AR at 31, fairly can be characterized as an initial responsibility determination that does not trigger referral to the SBA.  <u>See</u> <u>Blue Dot</u>, 179 Fed. App'x at 46 (<u>citing</u> <u>JT</u>

<u>Constr. Co.</u>, B-254257, 1993 WL 505803, at *4). <u>19/</u> The applicable provision, FAR 19.502-2(b), inherently includes an initial responsibility determination, as the regulation provides that "[t]he contracting officer shall set aside any acquisition over $100,000 for small business participation when there is a reasonable expectation that [] offers will be obtained from at least two <u>responsible</u> small business concerns . . . ." (emphasis added). As defendant emphasizes, plaintiff has not explained why a preliminary determination under FAR 52.219-14 is distinguishable from the other preliminary determinations that the Air Force has the discretionary authority to make under FAR 19.502-2(b).

Plaintiff's next criticism of the Air Force's use of the 50% subcontracting limitation in the SSS is that the NSS's requirements are too undefined for proper application of the rule. The parties do not dispute that the Air Force's requirements were undefined. However, the specific areas of expertise were listed, <u>see</u> AR at 30-31, and the Air Force did not unreasonably seek respondents that could supply them.

If plaintiff had identified its employees, as opposed to those of its subcontractor, defendant maintains that undefined tasks would not preclude the Air Force from evaluating the capabilities of the small business on a reasonable basis. Given that the Air Force was required to make an affirmative determination under FAR 19.502-2(b), the reasonableness of an inquiry made during the market-research stage of a procurement process should be measured against the nature of the procurement. <u>See</u> <u>JT Constr.</u>, No. B-254257, 1993 WL 505803, at *3. Given that the proposed contract, estimated to be a $36 million effort over a five-year period, was seeking technical support for the Air Force's counterproliferation and nuclear weapons efforts, <u>see</u> AR at 26, 31, the Air Force could "reasonably request the scope and type of information requested in the" SSS, <u>JT Constr.</u>, No. B-254257, 1993 WL 505803, at *3.

Plaintiff's final argument on the 50% requirement, and its bearing on the reasonableness of the D & F, is that the Air Force lacked a rational basis for concluding that plaintiff could not meet this 50% subcontracting requirement. Plaintiff maintains that it provided sufficient information for the Air Force reasonably to conclude that plaintiff could comply with the subcontracting limitation by: 1) its past performance of a 51% effort over

---

<u>19/</u> Plaintiff noted during oral argument that the Air Force imposed a heightened burden on plaintiff by requesting plaintiff to "[c]learly demonstrate," AR at 31, the ability as the prime to complete 50% of the effort overall and in each mission area. When read in context, the contracting officer's use of the word "clearly" appeals to the plain meaning of the word – "distinctly; plainly; manifestly, obviously," The New Shorter Oxford Dictionary, Vol. I, 415 (1993) – not to a legal standard such as clear and convincing evidence or proof.

the last five years of the ARSS contract (Pl.'s Br. filed May 4, 2009, at 13 <u>citing</u> AR at 115); 2) a table demonstrating its area coverage capability (<u>id.</u> <u>citing</u> AR at 117); 3) the resumes of fifty-nine individuals who would be able to provide services under the NSS contract, fourteen of whom are plaintiff's employees (<u>id.</u> at 14 <u>citing</u> AR at 124-255); and 4) a matrix evidencing that twelve of plaintiff's employees possess skills applicable to more than one mission area (<u>id.</u> <u>citing</u> AR at 120-21).  Plaintiff explains that it did not respond to Ms. Lindom's July 24, 2008 e-mail because plaintiff already had provided the requested information in its Statement of Capabilities and could not offer more specific information without a specific task distribution.

Defendant undermines plaintiff's position with two salient points.  First, defendant charges that plaintiff failed to establish it could satisfy the NSS's requirements through its own fourteen employees, and not through plaintiff's subcontractors.  Second, defendant reviews all of the resumes of the fourteen employees submitted by plaintiff, highlighting the bases upon which the NSS concluded it did not have a reasonable expectation that these employees could satisfy 50% of the contract effort.  <u>See</u> Def.'s Br. filed May 11, 2009, at 8-10.

Plaintiff's argument would be, and was, much more convincing when review of the reasonableness of the Air Force's decision was based on the D & F alone at the time defendant was arguing lack of jurisdiction and mootness.  And, although the administrative record reveals that the Air Force reluctantly performed the required analysis under FAR 19.502-2(b), and only did so after plaintiff forced the issue, the FAR does not require the Air Force to negate evidence of a predisposition.  The Air Force was required to allow plaintiff a full opportunity to make its case during the market-research phase of this procurement.  The court has read the three technical evaluations of the three respondents' Statements of Capabilities.  The evaluations at this early phase are more detailed, coherent, and explanatory than this court has seen in reviewing typical evaluations of technical proposals submitted in response to solicitations for competitive procurements.  Plaintiff's submission was treated fairly.  <u>See, e.g.,</u> <u>Centex Corp. v. United States</u>, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (stating that every contract includes the implied covenant of good faith and fair dealing).

Plaintiff has proved neither an unreasonable agency decision nor a clear and prejudicial violation of an applicable procurement regulation.  <u>20</u>/

---

<u>20</u>/  The omission of any other challenge made to the SSS is not an oversight.  Each was considered, if not discussed, in ruling on the parties' cross-motions.

V.  Other factors necessary for injunctive relief

Plaintiff has shown irreparable harm.  "An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed."  Bannum, 60 Fed. Cl. at 730 (quoting Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983), aff'd, 757 F.2d 247 (Fed. Cir. 1985)).  Nevertheless, the financial harm to plaintiff is displaced by the harm to the Air Force because of plaintiff's failure on the merits, and by defendant's strong (and dramatic) showing of harm the Air Force would suffer if a permanent injunction was granted.

Defendant submits that enjoining the Air Force from continuing with the current procurement process would delay a follow-on contract for another twelve months.  See (Second) Decl. of Capt. Norman, Apr. 16, 2009, ¶ 8.  Notably, this declaration was submitted following issuance of the preliminary injunction.  The NSS currently is receiving support under the DTRIAC contract, which expires on September 30, 2009.  Id. ¶ 3.  Absent support from the DTRIAC contract and the anticipated support from the current solicitation, the NSS would be forced to "suspend all studies and analysis until support could be procured through another means."  Id.  All efforts have "immense importance to defending this country from Chemical, Biological, Radiological, Nuclear and High Explosive (CBRNE) weapons of mass destruction."  Id.

Finally, the court must consider whether an injunction would be in the public's interest.  The court is charged by statute to give due deference to such a showing.  28 U.S.C. § 1491(b)(3) ("[T]he court[] shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.")  All the other considerations notwithstanding, Capt. Norman's assertions would weigh against a grant of an injunction against proceeding with the Solicitation absent a new determination whether the procurement is suitable for a set-aside. 21/

Plaintiff has not proven that the injunction is in the public interest.  The Air Force made a rational decision that complied with the applicable procurement regulation and decided to issue the Solicitation as a full and open competition.  Moreover, the Government has shown that enjoining the present procurement would hinder the Air Force's ability to perform and procure services concerning national security and defense.

_____

21/  The Federal Circuit has stated that "section 1491(b)(3) merely instructs courts to give due regard to the issue of national defense and national security in shaping relief." PGBA, 389 F.3d at 1226.

**CONCLUSION**

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.  Defendant's cross-motion for judgment on the administrative record is granted, and plaintiff's cross-motion is denied.  The Clerk of the Court shall enter judgment for defendant.

2.  The preliminary injunction entered on April 7, 2009, is dissolved.

3.  Defendant's motion to strike filed on May 13, 2009, is granted.  The Declaration of Anthony J.D. Contri, May 4, 2009, and the Affidavit of Joseph M. Pappe, May 4, 2009, appended to plaintiff's motion filed on May 4, 2009, are not proper supplementation of the administrative record.  These documents proffer facts that substitute plaintiff's opinion for the Air Force's technical determinations made regarding the Statements of Capabilities.

4.  By June 1, 2009, the parties shall identify by brackets any material subject to redaction before the opinion issues for publication.

No costs.

s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge